A. L. GRIFFIN, The, (COUNCER v.)

[See Councer v. The A. L. Griffin, Case No. 3,279.]

## Case No. 192.

### The ALHAMBRA.

[2 Ben. 158; 7 Int. Rev. Rec. 75.][1]

District Court, S. D. New York. Feb. 1868.

COLLISION AT SEA — STEAMER AND SCHOONER MEETING—CHANGE OF COURSE BY SCHOONER.

1. A steamer, steering south half west, off Cape Hatteras, in the night, made a schooner's green light one and a half or two points on her starboard bow, and changed her course to south-southeast, which she kept for ten or twelve minutes, the position of the light remaining about the same, and then changed her course to south, and ran on that course for fifteen minutes, the light remaining in about the same position, and the green light then went out of sight, and a red light came in view, whereupon the steamer's helm was at once ported, and her engine stopped and reversed, but too late to avoid the collision. The schooner, sailing north by east, with the wind south by east, made the steamer's light directly ahead, and being uncertain whether she was a steamer or a sailing vessel, ported her helm, and changed her course to northeast by north, and kept that course till she saw that the vessel was a steamer approaching on a course which would run her down, when she put her helm hard a-port, and changed her course to east by north. The speed of both vessels was about six or eight miles an hour, that of the schooner being a little the greater. Each vessel had her lights properly set and burning. The schooner was struck amidships on the port side, and sunk instantly. *Held*, that, on this state of facts, the 15th and 18th articles of the act of April 29th, 1864, prescribed the rules for the navigation of the vessels.

2. That it was a fault in the schooner to port her helm when she did so first, especially when she was uncertain whether the approaching light was that of a steamer or sailing vessel.

3. That that fault did not contribute to the collision.

4. That the fact that the position of the light ahead did not change after the steamer had changed her course to the eastward, ought to have been a clear indication to her that the schooner was proceeding in such a direction as to involve a risk of collision, and, under those circumstances, it was her duty to keep out of the schooner's way.

5. That the steamer ought to have ported before she did, and ought to have stopped and backed before she did.

6. That the last change of the schooner's helm to port, being made in the heat of danger, did not cause the collision, nor was it faulty.

In admiralty. This was a libel filed to recover damages for a collision, which took place between two and three o'clock A. M. on the 26th of June, 1865, about fifty miles to the northward of Cape Hatteras, between the steamship Alhambra and the schooner Wonder, by which the schooner was sunk and totally lost. The schooner was owned

[1][Reported by Robert D. Benedict, Esq., and here reprinted by permission. Partial report only given in 7 Int. Rev. Rec. 75.]

by Kinney and Smith. Smith was her master. He lost his life in the collision. The schooner was on a voyage from Nuevitas, in Cuba, to Philadelphia, and had a crew of seven men, namely, her master and Kinney, who was on board as supercargo, and a mate, a cook, and three men before the mast. She also had two passengers. They were lost in the collision. The mate was so injured that he afterward died. The mate and McLean, one of the seamen, were the only persons on deck on the schooner at the time of the collision, and for some time before, except two men, who were asleep in the boat. The schooner had her proper green and red lights burning. The wind was fresh, and about south by east. The schooner had eight sails set. The steamer was bound from New York to Charleston. The libel averred, that the course of the schooner was north by east; that the mate, who was on the lookout on the schooner, saw the lights of a vessel several miles distant, and directly ahead; that, until the vessels approached each other, it was uncertain to the schooner whether the vessel approaching her was a sailing vessel or a steamer; that, when the steamer's lights were discovered ahead, the course of the schooner was changed, by porting her helm, from north by east to northeast by north; and that she steadily kept on that course until after it was discovered that the approaching vessel was a steamer, and until she had approached so near as to make a collision imminent, and until it was found that the steamer was steering a course which would carry her against the schooner, when the wheel of the schooner was put hard to port, and she swung around to east by north, when the steamer, at full speed, and without slowing, stopping, or backing, struck the schooner on her port side, about amidships, and cut her in two and sunk her. The libel also averred, that the lights of the schooner were made by the steamer nearly or quite ahead, when the vessels were several miles apart, the course of the steamer being at the time south half west; that, upon discovering the lights of the schooner, the course of the steamer was changed to south-southeast, which brought the schooner more upon the starboard bow of the steamer; that the mate of the steamer supposed the schooner to be a steamer; that the steamer ran for several minutes on a south-southeast course, the schooner retaining her relative position to the steamer, which was an indication that their lines were crossing; that the course of the steamer was then changed to the south, which brought the lights of the schooner dead ahead; that the steamer continued that course for a short time, when she found herself rapidly nearing the schooner, and her wheel was put hard to starboard, which brought her directly across the schooner; that the order was immediately given to port the steamer's helm, but, before her wheel had reached amidships, she struck the schooner, the speed of the steamer

not being diminished, nor any signal given by her until after she had struck; that the collision was the fault of the steamer, in not having a proper lookout, in not porting instead of starboarding her wheel when she made the schooner's lights ahead, in not keeping still farther away after she had changed her course back to south and had made the schooner's lights ahead, in putting her wheel hard to starboard when she found herself approaching the schooner, in not blowing her whistle, in not slowing, stopping, and backing, and in not avoiding the schooner; that the schooner had a good lookout, and good and sufficient lights; and that her course was proper in changing to the right when she made the steamer's lights ahead, and in keeping to the right until the collision. The answer averred, that the steamer had the proper lights set, and had a proper lookout; that, at about ten minutes past two o'clock, the lights of the schooner were seen from the steamer, in proper time, about from one-half of a point to two points on the starboard bow of the steamer, showing a green light; that the helm of the steamer was starboarded, and she was kept on a south-southeast course for ten or fifteen minutes, which brought the schooner about two and a half points on the starboard bow of the steamer, a green light only being in sight to the steamer all the time; that, if the schooner had kept her course, as she should have done, the steamer would have cleared her by from 300 to 500 yards, but that the schooner wrongfully suddenly changed her course to cross the bows of the steamer, her green light passed out of sight, and her red light came in view, so near as to show the schooner, when the steamer's helm was immediately put hard to port, and her engine was at once stopped and backed, but it was not then possible to avoid the schooner on the course she had thus suddenly taken; that the schooner had no proper lookout, and did not have the proper lights set, and did not pursue the course prescribed by the rules of navigation, in altering her course instead of holding her course and passing on the starboard side of the steamer; and that the collision was wholly caused by the violation, by the schooner, of such rules and law, and by her altering her course and crossing the bows of the steamer.

Beebe, Dean & Donohue, for libelant.
Benedict & Benedict, for claimant.

BLATCHFORD, District Judge. It is clear, on the testimony, that each of the vessels had the proper lights set and burning, from the time the lights of each were discerned on board of the other, until the time of the collision, and that there was nothing but negligence or willful inattention that could prevent either of the vessels from reading correctly the language spoken by the lights of the other. The schooner knew, or was bound to know, that the other vessel was a steamer. The steamer knew, or was bound to know, that the other vessel was a sailing vessel. On this state of facts, the rules of navigation are clearly prescribed by statute. Article 15 of the act of April 29, 1864, (13 Stat. 60,) provides as follows: "If two ships, one of which is a sailing ship and the other a steamship, are proceeding in such directions as to involve risk of collision, the steamship shall keep out of the way of the sailing ship." Article 18 provides, that where, by article 15, the steamship is to keep out of the way, the sailing ship shall keep her course. The libel avers, that the course of the schooner was north by east when she made the lights of the steamer, the wind being south by east; that the schooner made the lights of the steamer directly ahead; that, for some time after the discovery by the schooner of the lights, and until the vessels had approached one another, it was uncertain whether the vessel approaching the schooner was a sailing vessel or a steamer; and that, when the lights were discovered ahead, by the schooner, that is, when the vessels were several miles apart, and while those on the schooner were uncertain as to whether the vessel approaching from directly ahead was a sailing vessel or a steamer, the schooner changed her course, by porting her helm, from north by east to northeast by north, a change of two points, and kept steadily on the latter course until after she discovered that the approaching vessel was a steamer and was on a course that would run down the schooner, when the schooner's helm was put hard to port till she headed east by north, in which position she was struck on her port side. The only person now living who was on the deck of the schooner at the time, and saw anything of the collision, was McLean, who had the wheel, the mate being on the lookout. McLean has been examined as a witness for the libellant. He says, that he was standing on the starboard side of the wheel when he first saw the approaching lights; that they were on the starboard bow, right ahead, his attention having been called to them by the mate; that the lights bore north by east from him; that, about a minute after seeing the lights, he, on an order from the mate, ported his wheel, and brought the schooner up to the northeast point; that, when that change had been made, it caused the lights to bear a point and a half or two points on the port bow of the schooner; that he ran on the northeast course a minute or a minute and a half and then changed to a course northeast by north; that, just at the moment of being struck, he put his wheel hard to port; and that it was from twenty-five to thirty minutes from the time he first saw the lights until the time of the collision. The testimony of McLean is explicit that, for full twenty minutes, he kept the northeast by north course. Now, by law, it was

clearly the duty of the schooner to keep her course, as against the approaching steamer, and it was the duty of the steamer to keep out of the way of the schooner. It was, therefore, bad navigation in the schooner to port her helm, when she saw the lights right ahead, and change her course first to northeast and then to northeast by north, the approaching lights being those of a steamer. Especially was it wrong in the schooner to make this change of course when, as appears from the libel, she was uncertain whether the lights were those of a steamer or of a sailing vessel. I am not satisfied, however, that this fault in the navigation of the schooner makes her chargeable with the collision.

The steamer made the schooner one and a half to two points on her starboard bow, and, acting on the indications that the approaching vessel was a sailing vessel, did not port her helm, but starboarded it, in order to keep out of the way of the schooner. The change by the steamer was from a course south half west to south-southeast, a change of two and a half points towards the east. The change made in the course of the schooner on sighting the steamer, was a change of from two to three points towards the east. The speed of each vessel was about the same—say six to eight knots an hour, that of the schooner being, perhaps, a little the greater. Now, on this state of facts, each vessel making the other nearly ahead, but a little on the starboard bow, one heading south half west and the other north by east, and each then changing to and running on a course about two and a half points further to the eastward, we should expect it to follow that, from the former vessel, the lights of the other vessel would, after the last change, take a bearing which would be preserved substantially unaltered during the running of the vessels on their several new courses. This result did follow. The testimony of Newbegin, the mate of the steamer, taken on the part of the claimants, shows that, while the steamer was running on her south-southeast course, which course she continued for ten or twelve minutes, the schooner continued all the time to bear about two and a half points on his starboard bow; that he then changed to a south course, and ran on that for fifteen minutes, and that the schooner still continued to bear not more than from two and a half to two and three-quarters points on his starboard bow; that the united speed of the two vessels was from sixteen to eighteen knots an hour; and that he first made the schooner's lights when she was about seven miles off. In twenty-five minutes, the vessels, at a united speed of sixteen knots an hour, would approach six miles and two-thirds of a mile nearer to each other. This approach of the schooner, without the bearing of her lights being substantially altered, while the course of the steamer was first south-south-east for ten minutes, and then south for fifteen minutes, ought to have been a clear indication to the steamer that the schooner was proceeding in such a direction as to involve a risk of collision. Under these circumstances, it was the duty of the steamer to keep out of the way of the schooner. The schooner, after she took a northeast by north course, kept it up to the very jaws of the instant peril. Her change to a northeast by north course from a course north by east did not contribute to the collision. It was wrong in the steamer to persist in starboarding her helm, and running on a course which, from the bearing of the schooner's lights, and the freshness of the wind, it ought to have been evident, would soon bring the two vessels into peril of collision. The steamer ought to have ported her helm before she did. If she had done so, she would have cleared the schooner, as the movement which the schooner made in the heat of danger in putting her helm hard to port, favored the chance that the steamer would, by porting, clear the schooner. Such movement of the schooner did not, on the evidence, cause the collision, nor was it faulty. The steamer ought to have kept out of the way. The schooner kept her course, and there was no special circumstance making it necessary for the steamer to take and keep the course she did. Moreover, the steamer did not soon enough slacken her speed, or soon enough stop and reverse. If she had done so at an earlier moment, she would have gone under the stern of the schooner, and so she would if she had ported at an earlier moment. There must be a decree holding the steamer liable for the collision, and for the damages caused by it, with a reference to ascertain and report the damages.